2013-1184

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

MICROSOFT CORPORATION,

Plaintiff-Appellee

v.

DATATERN, INC.,

Defendant-Appellant

Appeal from the United States District Court for the Southern District of New York in Case No. 11-CV-2365, Judge Katherine B. Forrest

## BRIEF OF APPELLEE MICROSOFT CORPORATION

Edward R. Reines
Andrew L. Perito
Evan N. Budaj
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

*Attorneys for Appellee Microsoft Corporation*

Dan Goettle
Dale M. Heist
WOODCOCK WASHBURN, LLP
1650 Market Street, 12th Floor
Cira Centre
Philadelphia, PA 19013
Telephone: (215) 564-8915

June 6, 2013

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Microsoft Corporation v. DataTern, Inc., 2013-1184

<u>CERTIFICATE OF INTEREST FOR MICROSOFT CORPORATION</u>

Counsel for Microsoft Corporation hereby certifies the following:

1. The full name of every party or amicus represented by me is:

Microsoft Corporation

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

No publicly held company owns 10 percent or more of the stock of Microsoft Corporation.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Kobre & Kim LLP:  Megha Jonnalagadda Charalambides, Philander Huynh, Michael Sangyun Kim, Matthew I. Menchel, Danielle Lauren Rose, Carrie Ann Tendler

Woodcock Washburn LLP:  Daniel J. Goettle, Aleksander J. Goranin, Dale M. Heist, Justine M. Leach, Jeffrey W. Lesovitz, C. Charlie Lyu, Steven J. Rocci

Snow Becker Krauss P.C.:  Evangelos Michailidis

Weil, Gotshal & Manages LLP:  Evan N. Budaj, Andrew L. Perito, Edward R. Reines

Dated:  June 6, 2013

*/s/ Edward R. Reines*
Edward R. Reines
*Attorney for Defendants-Appellees*
*Microsoft Corporation*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF RELATED CASES ...........................................................................2

JURISDICTIONAL STATEMENT ...............................................................................3

STATEMENT OF THE ISSUES....................................................................................4

STATEMENT OF THE CASE........................................................................................5

I.     DataTern's Motion To Stay Or Dismiss..........................................................5

II.    Claim Construction And Follow-Up ................................................................6

STATEMENT OF FACTS ..............................................................................................6

I.     The Parties ........................................................................................................6

       A.     Microsoft ................................................................................................6

       B.     DataTern .................................................................................................7

II.    The Patents........................................................................................................7

       A.     The '502 Patent .......................................................................................7

       B.     The '402 Patent .......................................................................................7

III.   The Accused Products ....................................................................................12

IV.    DataTern's Litigation Campaign ...................................................................12

       A.     The Customer Cases .............................................................................12

       B.     This Declaratory Judgment Action .......................................................13

              1.     Initial Filings ..............................................................................13

              2.     Claim Construction And Resolution...........................................14

SUMMARY OF THE ARGUMENT ............................................................................16

ARGUMENT .................................................................................................................18

I.     Standard of Review.........................................................................................18

II.    THE DISTRICT COURT CORRECTLY DETERMINED THAT
       THE '502 PATENT IS NOT INFRINGED .....................................................19

III.   THE DISTRICT COURT CORRECTLY DETERMINED THAT
       THE '402 PATENT IS NOT INFRINGED .....................................................19

       A.     The District Court Properly Construed "Logical Table" ....................20

i

i.  The Logical Table Is Defined As A Result Of A "Normalization" Process That Divides a Relational Database's Physical Table to Minimize Duplication ............................................21

   (a)  The Patent Requires A Specific Normalization Process For Non-Normal Tables That Results In A "Logical Table" ............22

   (b)  The Prosecution History Supports The Definition of Logical Table ...................................................................................25

   (c)  The Prior Art Confirms That The Logical Table Requires The Normalization Process Known To A Person Skilled In The Art ...........................................................................................27

ii.  DataTern's Claim Differentiation Arguments Fail ............................28

iii. The Logical Table "Can Be Utilized Like a Physical Table" .............31

B.  The District Court Properly Construed "Normalized Relational Schema Object Representing A Logical Table" .................................32

i.  The Relational Schema Must Be Normalized ...................................33

ii.  The NRSO Is An Object Containing Relational Schema That Is "Of the Logical Table" ....................................................................34

iii. DataTern's Vague and Unsupported Construction of NRSO Must Be Rejected ...............................................................................36

IV.  THERE IS, AND HAS BEEN, AN ACTUAL CONTROVERSY BETWEEN MICROSOFT AND DATATERN ..........................................38

A.  DataTern's Infringement Claims Against Microsoft Customers Feature ADO.NET and Underscore The Parties' Real and Substantial Controversy ....................................................................40

B.  DataTern's Attempts To Distinguish arris Are Meritless ...................45

C.  The District Court Properly Considered "All The Circumstances" Bearing On The Parties' Controversy .......................50

D.  DataTern's Litigation Strategy Provides Additional Support For The District Court's Exercise Of Jurisdiction ....................................52

CONCLUSION ...............................................................................................53

# TABLE OF AUTHORITIES

**Page(s)**

C**ASES**

*3M Co. v. Avery Dennison Corp.*,
673 F.3d 1372 (Fed. Cir. 2012) ...................................................................... 52

*ABB Inc. v. Cooper Indus., LLC*,
635 F.3d 1345 (Fed. Cir. 2011) ...................................................................... 47

*Andersen Corp. v. Fiber Composites, LLC*,
474 F.3d 1361 (Fed. Cir. 2007) ............................................................... 30, 31

*Arris Group, Inc. v. British Telecomms. PLC*,
639 F.3d 1368 (Fed. Cir. 2011) ................................................................passim

*Ass'n for Molecular Pathology v. United States PTO*,
653 F.3d 1329 (Fed. Cir. 2011) ............................................................... 18, 53

*BP Chems. v. Union Carbide Corp.*,
4 F.3d 975 (Fed. Cir. 1993) ............................................................................ 51

*Creative Compounds, LLC v. Starmark Labs.*,
651 F.3d 1303 (Fed. Cir. 2011) ...................................................................... 48

*Curtiss-Wright Flow Ctrl. Corp. v. Velan, Inc.*,
438 F.3d 1374 (Fed. Cir. 2006) ...................................................................... 31

*Cybor Corp. v. Fas Techs.*,
138 F.3d 1448 (Fed. Cir. 1998) ...................................................................... 19

*DataTern, Inc. v. Abbott Laboratories*,
No. 11-cv-00203 (E.D. Tex.) ........................................................................... 14

*DataTern, Inc. v. Abbott Laboratories*,
No. 11-cv-203 (E.D. Tex.) ................................................................................. 2

*DataTern, Inc. v. Eli Lilly & Co.*,
No. 2:10-cv-413 (E.D. Tex.) ............................................................................ 41

*DataTern, Inc. v. Eli Lilly and Company*,
No. 10-cv-00413 (E.D. Tex.) ........................................................................... 14

*DataTern, Inc. v. Eli Lilly and Company*,
No. 10-cv-413 (E.D. Tex.) ........................................................................... 2, 41

*DataTern, Inc. v. MicroStrategy, Inc.*,
No. 11-cv-12220 ................................................................................................. 3

*DataTern, Inc. v. Staples, Inc.*,
No. 10-cv-00133 (E.D. Tex.) ......................................................................... 2, 13

*Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc*,
347 F.3d 1314 (Fed. Cir. 2003) ...................................................................... 19

*Enzo Biochem, Inc. v. Applera Corp.*,
  599 F.3d 1325 (Fed. Cir. 2010) ....................................................29

*Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*,
  287 F.3d 1108 (Fed. Cir. 2002) .....................................................31

*Hewlett-Packard Co. v. Acceleron LLC*,
  587 F.3d 1358 (Fed. Cir. 2009) ........................................45, 52, 53

*Hoganas AB v. Dresser Industries, Inc.*,
  9 F.3d 948 (Fed. Cir. 1993) ..........................................................19

*Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*,
  599 F.3d 1377 (Fed. Cir. 2010) .................................................48, 49

*Johns Hopkins University v. CellPro, Inc.*,
  152 F.3d 1342 (Fed. Cir. 1998) .....................................................19

*Kessler v. Eldred*,
  27 S. Ct. 611 (1907) ....................................................................40

*Lighting Ballast Control LLC v. Phillips Electronics North Am. Corp.*,
  Nos. 2012-1014, -1015 (Fed. Cir. March 15, 2013) .........................19

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996) ....................................................................18

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) ................................................................46, 49

*Microchip Tech., Inc. v. Chamberlain Grp.*,
  441 F.3d 936 (Fed. Cir. 2006) ..................................................45, 49

*Prasco v. Medicis Pharm. Corp.*,
  537 F.3d 1329 (Fed. Cir. 2008) .....................................................52

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998) .....................................................27

*SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*,
  859 F.2d 878 (Fed. Cir. 1998) ......................................................19

*SRAM Corp. v. AD-II Eng'g, Inc.*,
  465 F.3d 1351 (Fed. Cir. 2006) .....................................................30

*Vitronics Corp. v. Conceptronic*,
  90 F.3d 1576 (Fed. Cir. 1996) ......................................................37

**STATUTES**

28 U.S.C. § 1295(a)(1)......................................................................4

28 U.S.C. §§ 1331, 1338, and 2201 ...................................................4

iv

## OTHER AUTHORITIES

Claim Construction Order, A34 ................................................................................. 6

Fed. Cir. R. 25, I ..................................................................................................... 55

Fed. R. App. P. 25 ................................................................................................... 55

Fed. R. App. P. 32(a)(7)(B)(i) ................................................................................ 56

Fed. R. App. P. 32(a)(7)(C), I ................................................................................ 56

Rule 11 .................................................................................................................... 51

U.S. Patent No. 5,937,402 ............................................................................... passim

U.S. Patent No. 6,101,502 ............................................................................... passim

## ABBREVIATIONS AND CONVENTIONS

"Microsoft" means the Plaintiff-Appellee.

"DataTern" means the Defendant-Appellant.

"SAP" means SAP AG and SAP America, Inc., collectively.

"'402 Patent" means U.S. Patent No. 5,937,402.

"'502 Patent" means U.S. Patent No. 6,101,502.

"SAP Appeal" means *SAP AG and SAP America, Inc. v. DataTern, Inc.*, Appeal

No. 13-1185 (Fed. Cir.).

"SAP Case" means *SAP AG and SAP America, Inc. v. DataTern, Inc.,*

No. 11-CV-2648 (S.D.N.Y.)

"BB" means DataTern's Blue Brief in this appeal.

"NRSO" means normalized relational schema object.

## PRELIMINARY STATEMENT

Remarkably, DataTern's meritless litigation campaign against Microsoft's customers continues to this day, despite the District Court's judgment of non-infringement that DataTern challenges on appeal. Based on Microsoft's declaratory judgment action, the District Court found not infringed—for four independent reasons based on three different claim terms—the lone asserted independent claim in the first of two patents that DataTern was asserting. The District Court found the second patent not infringed based on the construction of two additional claim terns.

But DataTern is continuing to assert its patents in many district court actions against a host of defendants to pressure for more nuisance settlements. It thus has sought to keep this matter alive in an attempt to support its arguments that the District Court's claim construction and judgment should not be afforded preclusive effect so the monetization can continue. This explains DataTern's strained appeal. DataTern must establish that three different claim terms in one patent, and two more in a second patent, were wrongly construed. The merits simply do not support this kind of broadside on the District Court's claim construction ruling. DataTern also must prove that any such errors were not "harmless." To wit, DataTern must show that, even if the constructions are changed, a new

construction for each holds the promise to support an infringement claim. It does not even attempt to prove this. In addition, DataTern requests that the Court eliminate a series of other claim requirements found by the District Court, which were not the basis for summary judgment. This effort fails as well.

As established below, the judgment should be affirmed.

**STATEMENT OF RELATED CASES**

Microsoft certifies that no appeal from this civil action was previously before this or any other appellate court. There are many related matters because DataTern has aggressively asserted its patents, albeit unsuccessfully.

**The District Court Cases Against Microsoft's Customers**

Microsoft brought this declaratory judgment action because DataTern threatened many Microsoft customers for their use of Microsoft's database products and had sued many of them. Although many customers settled for nuisance value, three Texas cases remain pending. *See DataTern, Inc. v. Staples, Inc. et al.*, No. 10-cv-133 (E.D. Tex.); *DataTern, Inc. v. Eli Lilly and Company et al.*, No. 10-cv-413 (E.D. Tex.); *DataTern, Inc. v. Abbott Laboratories et al.*, No. 11-cv-203 (E.D. Tex.).

**DataTern's Appeal Of Its Loss To SAP**

DataTern is also pursuing an appeal against SAP. That matter is Appeal No. 13-1185. Although there are common issues with the SAP Appeal, each appeal

also includes unique issues. The SAP Case and this case were consolidated below because they both involve the same two DataTern patents ('402 and '502 Patents). A723 [Order]; A736 [Order].

**DataTern's Appeal Of Its Loss To MicroStrategy**

DataTern also sued MicroStrategy and its customers in Massachusetts, alleging infringement of the '502 Patent. The lead case is *DataTern, Inc. v. MicroStrategy, Inc. et al.*, No. 11-cv-12220. Eight cases have been consolidated with that lead case. *See* D. Mass. Case Nos. 11-cv-12024; 11-cv-12025; 11-cv-12026; 11-cv-12028; 11-cv-12223; 11-cv-12224; 11-cv-12225; 11-cv-12227.

DataTern lost those cases too and has appealed. *See* Appeal No. 13-1251 and Appeal No. 13-1252. Those two appeals are consolidated with each other.

***

Counsel are aware of no other case pending in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

## JURISDICTIONAL STATEMENT

On December 26, 2012, the District Court entered judgment granting Microsoft's non-infringement summary judgment motion. A69. DataTern appealed. A3503.

The District Court properly had jurisdiction over Microsoft's declaratory judgment complaint, pursuant to 28 U.S.C. §§ 1331, 1338, and 2201, as explained more fully below. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

**STATEMENT OF THE ISSUES**

1. Whether the District Court's non-infringement summary judgment for the '502 Patent should be affirmed where, to prevail, DataTern must prove that three different claim terms were all improperly construed:

   (1) "object model"

   (2) "to create an interface object"

   (3) "runtime engine."

2. Whether the District Court's non-infringement summary judgment for the '402 Patent should be affirmed where, to prevail, DataTern must prove that two different claim terms were improperly construed:

   (1) "logical table"

   (2) "normalized relational schema object."

3. Whether DataTern has shown, for each construction it challenges, that the alleged error would change the outcome.

4. Whether the District Court properly exercised jurisdiction over Microsoft's declaratory judgment claims.

4

# STATEMENT OF THE CASE

DataTern provoked this litigation. In 2009 DataTern began a mass litigation campaign against numerous Microsoft customers (and others) with the objective of garnering nuisance settlements. To defend its products and customers, Microsoft filed this declaratory judgment action on April 7, 2011. *See* A509 [Complaint]. Microsoft prayed for a declaratory judgment that: (1) the Patents-in-Suit were invalid, and (2) neither Microsoft nor its products infringe or have infringed." *See* A517-19 ¶¶ 30-43; *see also* A509 ¶ 1. This case was consolidated with the SAP Case for pretrial proceedings. A723 [Order]; A 736 [Order].

## I. DATATERN'S MOTION TO STAY OR DISMISS

DataTern alleged that Microsoft infringed both Patents-in-Suit. *See* A713 [Counterclaims]. At the initial case management conference, DataTern stated it intended to move to dismiss or to stay the case. *See* A723 [Order].

DataTern filed its promised motion on July 22, 2011, which was denied. *See id.*; A23-24 [Hearing Transcript]; A1 [Order]. In seeking a stay, DataTern sought to halt this case in favor of its customer suits in Texas. *See* A739 [DataTern's Motion to Stay/Dismiss].

On February 9, 2012, Judge Holwell retired and this case was reassigned to Judge Forrest. *See* A6230 [Notice of Reassignment]. Days later, DataTern moved

for reconsideration of its motion to stay/dismiss. *See* A982 [Motion for Reconsideration]. Judge Forrest denied that motion. *See* A31-33 [Order].

## II. CLAIM CONSTRUCTION AND FOLLOW-UP

Based on a lengthy claim construction hearing and extensive briefing in both this case and the SAP Case, which were consolidated for pre-trial purposes, A723 [Order], the District Court issued its Claim Construction Order, A34 [CC Order]. In light of the Claim Construction Order, DataTern conceded noninfringement. *See* A6152 [Letter to Judge Forrest]; A2288 [Gupta Report]. The District Court issued an Order granting Microsoft's motion for summary judgment on the basis of DataTern's concessions that there are four separate reasons why it cannot prove infringement. A67.

## STATEMENT OF FACTS

## I. THE PARTIES

### A. Microsoft

Plaintiff-Appellant Microsoft is a Washington corporation headquartered in Redmond, Washington. A510 [Microsoft's Complaint] ¶ 2. Microsoft was founded in 1975, and generates revenue by developing, licensing, and supporting a wide range of software products and services, by designing and selling hardware, and by delivering relevant online advertising to a global customer audience. Microsoft's Server and Tools division develops and markets server software,

software developer tools, services, and solutions designed to make information technology professionals more productive and efficient. Microsoft does business worldwide, with 90,000 employees in over 190 countries supporting and developing varied products and services for its customers and partners.

## B. DataTern

Defendant-Appellee DataTern is a wholly-owned subsidiary of the New York-based, publically-traded venture capital company, Amphion Innovations. *See* A714 [DataTern's First Am. Answer] ¶ 9; A511 [Complaint] ¶ 9. DataTern was formed on April 5, 2007 to enforce and monetize the Patents-in-Suit. *See* A3808 [Amphion 2009 Annual Report]; A3873-3874 [Amphion 2010 Annual Report].

## II. THE PATENTS

### A. The '502 Patent

The issues in this appeal relating to the '502 Patent are essentially the same as those presented in co-pending SAP Appeal, No. 13-1185. For efficiency, as it relates to the '502 Patent, Microsoft relies on SAP's brief submitted in the SAP Appeal.

### B. The '402 Patent

The '402 Patent was filed on June 19, 1997, and issued on August 10, 1999. *See* A521 ['402 Patent]. It describes a method of interfacing an object-oriented

application with relational database tables—purportedly, "to resolve issues related to the object-relational mismatch." A1081 [DataTern's Opening CC Br.]. The "mismatch" arises from the different ways that object-oriented applications and relational databases store and access data. A1174-75 [Hosking Decl.] ¶¶ 53-54; A3305 ['402 Patent] 1:37-42. The patent claims to solve this problem through the use of "logical tables" created as part of a "normalization process." *See* A3282 ['402 Patent, Abstract]; A3305 [same] 1:17-18, 45-60; A3306 [same] 4:29-34; A1202-06 [Hosking Decl.] ¶¶ 111-117.

The "object model" of a program is the "collection of classes that define the objects that will interact with one another at run time . . . to carry out the functionality of the application." *See* A1163 [Hosking Decl.] ¶ 29. An object model reflects the organization of an object-oriented software application much as a database "schema" reflects the organization of a relational database, as described below. *See* A1130 [Gupta Decl.] ¶ 17; A1163-65 [Hosking Decl.] ¶¶ 29-34; A1376-77, 1379 [CC Slides].

Relational databases store data in tables called "relations," which are organized into rows and columns. A1166-67 [Hosking Decl.] ¶ 38-39. Tables can cross-reference each other through the use of "primary keys" and "foreign keys" assigned to columns of the tables. A1167-69 ¶¶ 40-44. A properly-assigned primary key must be a column (or columns) that uniquely identifies each row in a

table, which means that the data in each row (or combination of rows taken together) must have a value (or combination of values) not duplicated in any other row in the same column (or columns). *Id.*; A1556-61 [CC Slides]. A foreign key assigned in one table is a cross-reference to a primary key in another table. A1169 [Hosking Decl.] ¶ 44. The organization of a relational database is referred to as its schema. It typically includes information about the tables in a database such as table names and column headings. A1201 [Hosking Decl.] ¶ 106; A1130 [Gupta Decl.].

A "non-normal" table is a relational database table that is not in a simple (i.e., normal) format but instead has some amount of duplication. This duplication is minimized by a "normalization" process that splits the table into two or more tables. A3305 ['402 Patent] 1:30-32; A1170-74 [Hosking Decl.] ¶¶ 46-48, 51-52; A1203 [same] ¶ 112. The '402 Patent discusses two methods for facilitating the interaction between an object-oriented application and a relational database. The first is for database tables already in normal form, and the second, which uses "logical tables," is for database tables in ***non-normal*** form. A3282 ['402 Patent, Abstract]; A1203-06 [Hosking Decl.] ¶¶ 113-18. As explained below, *see infra* at 11-13, the claims of the '402 Patent relate only to the latter method that uses logical tables—a required element of all claims—for database tables in "non-normal" form.

The patent refers to the interface between the application and the database as the "Integrator Runtime System," shown in Figure 2 as element 24. A3285, 3305-06 ['402 Patent] fig.2 & 2:66-3:2. The first method—for use with database tables already in normal form—is described with respect to Figures 1-4. A3285-86, 3305-06 figs.1-4 & 2:44-4:8. The patent explains that a capture process is applied to determine the schema of a relational database. A3306 3:21-35. From this captured schema, "relational schema objects" are created, A3305-06 2:52-59; 3:21-35, 40-48, and a mapping process is used to create mapping schema objects, *id.* at 2:44-60. At run time (i.e., when the object-oriented application is run), the application is able to access data in the relational database by using these two types of schema objects (both stored in the Integrator Repository). A1201-02 [Hosking Decl.] ¶¶ 106-10.

The second method relates to the claimed invention and is similar to the first, but adds a special step to the first method, a "normalization" step, described with respect to Figure 5. *See* A3287 ['402 Patent, fig.5]; A3307 4:29-41; A1202-05 [Hosking Decl.] ¶¶ 111-15.



**FIG. 5**

This special normalization step analyzes the schema of the database table and creates "logical tables" *outside* the database. A1205-06 [Hosking Decl.] ¶¶ 115-16. According to the patent, though the logical tables are not part of the relational database, they "can be utilized like a relational table." A3282 ['402 Patent, Abstract]. The patent further explains, "[o]nce a denormalized table is captured from a database the normalization process allows the user to define different logical tables using subsets of the columns of the [database] table." A3289, 3305 ['402 Patent] fig.7 & 1:55-58. After the normalization process defines the logical tables, the second method is similar to the first method in that it forms relational schema objects. Because these relational schema objects are based on the

11

normalized schema of the logical tables—as opposed to the denormalized schema of a relational-database table—the patent refers to them as "normalized" relational schema objects. A3312 15:63-66; *see also* A3306 4:25-28 (creating "new integrator Relational Schema Objects [NRSO] from existing captured tables instead of from the database"); A1205-06 [Hosking Decl.] ¶¶ 116-17.

The asserted claims relate to this normalization process for creating logical tables and normalized relational schema objects.

## III. THE ACCUSED PRODUCTS

Microsoft's accused products (ADO.NET, ADO.NET Entity Framework, and LINQ-to-SQL) are programming tools that help software developers create computer applications. In particular, the products make it easier for the developers to create applications that can retrieve and change data stored in relational databases without requiring that the developers fully understand how the database stores the data. *See* A2304 [MSDN Documentation]; A2339 [same]; A2353 [same].

## IV. DATATERN'S LITIGATION CAMPAIGN

### A. The Customer Cases

In 2009 DataTern brought suit against Microsoft customers in four different actions in the Eastern District of Texas: *DataTern, Inc. v. The Allstate Corporation et al.* (09-cv-00178); *DataTern, Inc. v. Staples, Inc. et al.*, No. 10-cv-

00133 (E.D. Tex.); *DataTern, Inc. v. Eli Lilly and Company et al.*, No. 10-cv-00413 (E.D. Tex.); and *DataTern, Inc. v. Abbott Laboratories et al.*, No. 11-cv-00203 (E.D. Tex.). *See* A3635-38 [Opp. DataTern's Motion to Stay/Dismiss]. In these four cases, DataTern sued a total of 72 defendants for infringement of the '402 and/or '502 Patents, including many users of Microsoft's ADO.NET and related technologies and products. *See id.*; A515 [Complaint] ¶ 24; A715 [Am. Answer] ¶ 24. It is evident from the settlement amounts and number of defendants that, through this litigation campaign, DataTern intended to garner below-cost-of-defense settlements rather than prove patent infringement. *See* Settlement Agreements for Microsoft Customers: A6044 [BP]; A6090 [Regions Financial]; A6105 [Eli Lilly]; A6129 [Abbott Laboratories].

### B. This Declaratory Judgment Action

#### 1. Initial Filings

After receiving indemnity requests from numerous defendants in DataTern's Texas infringement actions, *see, e.g.*, A744-976 [Killough Decl. and Exhs. thereto], Microsoft filed this action, *see* A517-518 [Complaint] ¶¶ 30-43.

DataTern filed broad counterclaims alleging infringement of the '402 and '502 Patents, by Microsoft and its customers, for their use of Microsoft's products. A717-721 [Counterclaims] (accusing of infringement "certain software programs and programming tools [] including, *inter alia*, ADO.Net, MS LINQ, and Visual

Studio") (emphasis in original[1]).  In its answer, DataTern acknowledged it sent Microsoft's customers "claim charts showing infringement of the '402 and/or '502 patents."  A715 [Answer] ¶ 24.

DataTern labeled its counterclaims "conditional" depending on whether the District Court moved forward with the case.  *See* A717 [Counterclaims].  Those conditions were met when the District Court denied DataTern's motion to stay/dismiss.  *See* A1 [Order]; A31[Order].

### 2.   Claim Construction And Resolution

After the District Court issued its Claim Construction Order, DataTern conceded that it could not prove infringement.  *See* A1863 [Order].  In DataTern's infringement expert report, Mr. Gupta stated that none of the accused products met the limitations of the asserted claims of the '502 Patent "because of the ***combination*** of the Court's constructions of 'object model,' 'to create at least one interface object,' and 'runtime engine.'"  A2289 [Gupta Report].  With respect to the '402 Patent, Mr. Gupta opined that none of the accused products met all of the limitations of the asserted claims "because of the ***combination*** of the Court's constructions of 'logical table' and 'normalized relational schema object.'"  A2408-09 [Gupta Report].

---

[1] Emphasis supplied throughout, unless otherwise noted.

The parties submitted to the District Court competing proposals on how to proceed in light of DataTern's generalized concession of noninfringement. Microsoft suggested that it depose Mr. Gupta on his report, and then, through summary judgment briefing, a fulsome appellate record would be developed that would identify the specific non-infringement grounds. *See* A6154-56 [Letter to Judge Forrest]. Microsoft explained that this procedure would provide "facts in the record that would assist [the appellate courts'] ability to determine whether a *particular* claim term plays a determinative role in infringement or invalidity." *Id.*

DataTern's counterproposal requested that the District Court enter judgment for Microsoft based only on DataTern's generalized concession of noninfringement. *See* A6162-6163 [Letter to Judge Forrest]. At the same time, DataTern filed a "Request for Entry of Declaratory Judgment" asking the District Court to enter judgment based on a "combination" of the District Court's claim constructions—apparently to try to increase its chance of success on appeal. *See* A1874 [Request for Entry of Declaratory J.]. The District Court denied this request, having already agreed with Microsoft to proceed with summary judgment on a fulsome record that would flush out which particular constructions are unsatisfied. *See* A1887 [Order].

Microsoft filed its summary judgment motion on October 26, 2012. *See* A1890. In its opposition to Microsoft's motion, DataTern conceded that Microsoft

was entitled to summary judgment on the '502 Patent on three *independent* bases following from the construction of three terms, A2175-77 [Partial Opp. to SJ], and the '402 Patent on two *independent* bases following from the construction of two terms, *see* A2169 [same].

Based on these concessions, the District Court entered summary judgment. *See* A5309 [Motion for SJ]; A2175-77 [Partial Opp. to Motion for SJ]; A67 [Order].

## SUMMARY OF THE ARGUMENT

DataTern threatened and sued Microsoft customers on a mass basis, not Microsoft itself, and routinely pressed for nuisance-value settlements. This behavior is explained by the weakness of DataTern's infringement claims based on the '402 and '502 Patents, which apparently were never intended to be tested in court. In response, to protect its products, and in the face of customer demands for defense and indemnity, Microsoft brought a declaratory judgment claim for non-infringement of those two patents to prove that its products did not infringe and that, accordingly, neither Microsoft nor its products had induced or contributed to the alleged infringement by customers.

After extensive claim construction proceedings, and a full discovery period, both of which were consolidated with the SAP Case, DataTern admitted that it could not prove infringement of the '502 Patent based on three different claim

terms, and the '402 Patent based on two different claim terms.

On appeal DataTern must obtain reversal the construction of the three different claim terms in the only asserted independent claim of the '502 Patent and of two different claim terms in the independent claims of the '402 Patent. Moreover, DataTern must establish that each of the changes in the construction it seeks have the potential to change the outcome on the non-infringement judgment.

Overall, DataTern's attacks on the District Court's claim constructions miss the mark. And in each instance, DataTern's challenge lacks merit because the accused products are fundamentally different from the claimed invention in a plethora of ways. Moreover, DataTern does not even attempt to show how each of the claim construction changes it seeks would properly support an infringement judgment, rendering the alleged errors harmless in any event.

Finally, DataTern's argument that this appeal does not present a justiciable controversy must be rejected.

The judgment should be affirmed.

# ARGUMENT

## I. STANDARD OF REVIEW

Whether an actual case or controversy exists is reviewed *de novo*. *Ass'n for Molecular Pathology v. United States PTO*, 653 F.3d 1329, 1343 (Fed. Cir. 2011).

Claim construction is a "mongrel practice," *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 378 (1996), which this Court currently reviews *de novo*,[2] *Cybor Corp. v. Fas Techs.*, 138 F.3d 1448, 1454-56 (Fed. Cir. 1998).

This Court reviews a district court's grant of summary judgment de novo. *Johns Hopkins University v. CellPro, Inc.*, 152 F.3d 1342 (Fed. Cir. 1998). DataTern bears the burden to show that each error it alleges in the District Court's claim constructions is not "harmless" to the District Court's judgment of non-infringement. *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878 (Fed. Cir. 1998) ("On appeal it is [appellant's] burden to show not only that the district court erred, but also to persuade this court that had such error not occurred the result might have been different."); *see*, *e.g*, *Deering Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc*, 347 F.3d 1314, 1324 (Fed. Cir. 2003) (affirming summary judgment of non-infringement because the appellant did

---

[2] This standard is under review. *See Lighting Ballast Control LLC v. Phillips Electronics North Am. Corp.*, Nos. 2012-1014, -1015 (Fed. Cir. March 15, 2013). If the law changes, this Court may afford deference to the District Court's claim construction, although Microsoft prevails under any standard of review.

not carry its burden to prove the claim construction errors would change the outcome); *Hoganas AB v. Dresser Industries, Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) (same).

## II. THE DISTRICT COURT CORRECTLY DETERMINED THAT THE '502 PATENT IS NOT INFRINGED

As explained in SAP's brief at 20-48, submitted in the SAP Appeal, No. 13-1185, the District Court's construction of the disputed claims of the '502 Patent is proper. Those constructions provide multiple, independent grounds to affirm summary judgment of non-infringement of the '502 Patent. To condense the briefing and for efficiency, Microsoft refers the Court to SAP's briefing regarding the '502 Patent.

## III. THE DISTRICT COURT CORRECTLY DETERMINED THAT THE '402 PATENT IS NOT INFRINGED

The District Court granted Microsoft's summary judgment of non-infringement of the '402 Patent based on DataTern's concessions. A67 [Order]; A2169 [Opp'n to Motion for SJ]. DataTern conceded that the District Court's constructions of "logical table" and "normalized relational schema object representing a logical table" eliminated its infringement theory because none of the accused products has a logical table or NRSO containing schema of the logical table that "results from a normalization process that divides at least one of the physical tables into two or more tables to minimize duplication." A2169 [Opp'n to

Motion for SJ].

As explained above, *see supra* Statement of Facts, § II.B, the "normalization" process of the '402 Patent is central to the claimed invention. The claim terms "logical table" and NRSO reinforce and must be read and understood in context with each other. The patent and prosecution history confirm that these terms require a normalization process to facilitate interaction between a relational database storing physical tables in non-normal form and an object-oriented application. A3305 ['402 Patent] 1:30-33, 1:45-57.

## A. The District Court Properly Construed "Logical Table"

The District Court construed "logical table" as a "table outside a relational database that can be utilized like a physical table [i.e., a table in a relational database] and that results from a *normalization process* that divides at least one of the physical tables into two or more tables to minimize duplication." A65.

A "non-normal" table is not in a simplified ("normal") format but, instead, includes, for example, duplicate data. A3305 ['402 Patent] 1:30-32; A1170 [Hosking Decl.] ¶ 46. The claimed invention starts with a non-normal physical table containing duplicate data and defines what the patent calls "logical tables." As will be explained further below, the patent makes clear that these logical tables are the result of dividing a database's non-normal physical table into two or more logical tables through a prior-art process called "normalization" to minimize data

20

duplication  *See* A3282 ['402 Patent, Abstract]; A3305 ['402 Patent] 1:54-56; A3287 ['402 Patent, fig.5]; A3289 ['402 Patent, fig.7]; A1205-06 [Hosking Decl.] ¶¶ 115-18].

### i. The Logical Table Is Defined As A Result Of A "Normalization" Process That Divides a Relational Database's Physical Table to Minimize Duplication

The meaning of "logical table" as it relates to the '402 Patent is specified in the patent itself.  *See supra*, Statement of Facts, § II.B; A1327 [Gupta Tr.] 95:19-21.  DataTern agrees that "logical table has a meaning specific to the '402 Patent." *Id.* ("Yes, I would say that's a correct statement.").

The patent's "Detailed Description of the Invention" section first introduces the concept of a "logical table" in Column 4.  The patent explains that the "logical table" is the product of a normalization process and defines it as such:

> [T]he **normalization process** allows the user to define different tables using subsets of columns of the table AP. This new table is hence a **subset of a real physical table** in the database and is **henceforth referred to as a logical table.**

A3306 ['402 Patent] 4:29-34.  While this definition is alone sufficient to reject DataTern's proposed construction, the remaining intrinsic and extrinsic evidence also support Microsoft's constructions.

The patent consistently describes the "logical table" as a result of normalization.  *See, e.g*, A3282 ['402 Patent, Abstract]; A3289 [fig.7]; A3307

21

['402 Patent] 4:54-5:15 (showing "Integrator Normalization Process" 32 results in logical tables "Table P_L" and "Table A_L"); A3305 ['402 Patent, Summary of Invention] 1:54-57; A3307 ['402 Patent] 5:58-6:2; *see also* A56-57 [CC Order]. And, lest there were any doubt, the prosecution history distinguishes prior-art logical tables created through processes other than normalization (i.e., by denormalizing). *See* A203-04 [10/21/1998 Response to Office Action] ("Thus Maloney teaches a system of forming logical tables more similar to *denormalizing* then [sic] to normalizing."). Finally, the well-known prior-art normalization process for relational databases complements the specification's description of normalization. *See infra* at 27-28. Accordingly, Microsoft proposed—and the District Court adopted—a construction requiring that the logical table "results from a normalization process that divides at least one of the physical tables into two or more tables to minimize duplication." A65 [CC Order].

> **(a)** **The Patent Requires A Specific Normalization Process For Non-Normal Tables That Results In A "Logical Table"**

The specification describes normalization as a process that divides a physical table into two or more logical tables to minimize data duplication in the original table. In the "Background of the Invention" section, the specification explains that "[r]elational databases typically **separate data into a plurality of**

22

**tables** through a process known as 'normalization' to minimize duplication." A3305 ['402 Patent] 1:30-32.

Similarly, the abstract explains, once "a denormalized table is captured from a database the **normalization process allows** the user to define **different logical tables using subsets of the columns of the table**." A3282 ['402 Patent, Abstract]. Likewise, with respect to figures 5 and 7, the patent specification describes a normalization example that starts with a non-normal table stored in a relational database called "table AP," which is then normalized to create two logical tables. A3287 ['402 Patent, fig.5]; A3306 ['402 Patent] 4:29-41; A3289 ['402 Patent, fig.7]; A3306-07 ['402 Patent] 4:54-5:15 (showing "Integrator Normalization Process" **32** results in logical tables "Table P_L" and "Table A_L."). This description makes clear—contrary to DataTern's argument, BB21, BB43-44—that the District Court's construction does not require the division of *physical* tables in the relational database. Instead, normalization in the '402 Patent divides data into multiple *logical* tables without any effect on the underlying physical table. *See id.*

DataTern's principal argument is that the specification discloses two "preferred embodiments" that must be covered by the claims, only one of which operates on database tables in non-normal form (and thus requires a normalization process to create logical tables). *See* BB18-20. This argument fails for multiple

reasons. Perhaps most important, one of the purportedly "preferred" embodiments cited by DataTern does not include any "logical table," which the patent makes clear is the heart of the supposed invention. For example, the abstract and summary of invention make clear that the special sauce of the patent includes the use of the "logical table." *See* A3282 ['402 Patent, Abstract]; A3305 ['402 Patent] 1:45-47 ("***In accordance with the present invention, logical tables*** … are employed to facilitate interaction between user applications and a relational database.").

Furthermore, every claim requires both a logical table and normalized data (e.g., forming an NRSO). A3312-16 ['402 Patent]. And nowhere does the patent describe a logical table separate from a normalization process. In fact, the patent-defining concept of a "logical table" is not even mentioned with regard to the first method, shown in Figure 1, which is described in the first two-and-a-half columns of the "Detailed Description" (until Column 4, Line 9). This section nowhere mentions either a "logical table" or normalization. A3305-06. The first time that the "Detailed Description" introduces—and defines—"logical table" is relating to Figure 5, which is similar to Figure 1 but adds a "Normalization Process" at element 32." A3306 ['402 Patent] 4:24-33; *see also* A1543-47 [CC Slides].

DataTern presumes that the captured table of the so-called first embodiment described in Figure 1 is in fact a logical table. BB19 (arguing that "no

normalization process for the captured table (i.e., the logical table) is required"). But DataTern ignores that the patent nowhere describes use of a logical table where there is no normalization process. As documented above, logical tables are only described in conjunction with normalization and neither logical tables nor normalization is even *mentioned* in the portion of the patent on which DataTern so heavily relies.

To attempt to patch this problem, DataTern relies on a passage in Column 5 that *any* captured physical table "can be used to define a logical table." BB40. DataTern contends that this statement means that even normal tables that do not require normalization are usable to define logical tables. The fundamental problem with this position is that this passage is located in the midst of the discussion of Figure 7, which is all about normalization. A3305 ['402 Patent] 2:6 ("FIG. 7 illustrates the normalization process"). In context, "any" does not mean that the tables are unrelated to normalization. The whole point of the Figure 7 section is to describe normalization! Rather, the context of the paragraph makes clear that the normalization process of Figure 7 can be used to define logical tables regardless of whether the physical tables have a key designation (i.e., the process applies to "any" table regardless of key designation).

        **(b)**    **The Prosecution History Supports The Definition of Logical Table**

The prosecution history also supports that "logical tables" are defined as a result of a normalization process that divides a physical table of a database into two or more logical tables to minimize duplication. To overcome a rejection of the pending claims during prosecution, the applicants distinguished prior art. Specifically, they argued that combining tables together as disclosed in a prior-art reference was "more similar to denormalizing" than the claimed normalization method, in which one table was divided into two or logical more tables:

> In distinct contrast to the presently claimed invention, Maloney explicitly teaches a system for combining pairs of tables, wherein the combined pairs have a common field, in order to form logical tables. Thus **Maloney teaches a system of forming logical tables more similar to denormalizing th[a]n to normalizing**. The resulting logical tables in Maloney cannot, accordingly, be considered similar to the logical table represented by the normalized relational schema objects of the presently claimed invention.

A203 [10/21/1998 Response to Office Action]. Thus, the applicant described the claimed "logical tables" in the patent as the result of normalization – as opposed to Maloney's denormalization. This fully supports the District Court's construction. *See Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998) (affirming a construction supported by the specification where the patentee's statements distinguishing prior art during prosecution also confirmed the district court's claim construction analysis).

26

**(c)    The Prior Art Confirms That The Logical Table Requires The Normalization Process Known To A Person Skilled In The Art.**

The meaning of "normalization" as a process that divides a single relational database table into two or more tables is further supported by extrinsic evidence. As of the '402 Patent's filing, normalization was well-known in database management.   A1169-74 [Hosking Decl.] ¶¶ 45-52.   Various dictionaries and textbooks demonstrate that a skilled artisan at that time would have understood normalization to involve splitting tables or "relations" (i.e., physical tables) into multiple tables or "record groups" for minimizing duplication of information to assist in efficient processing of that information:

> Normalization is a procedure in which a **single table** (i.e., a relation) is "**converted into a set of relations** [tables] in a more desirable form." A4579 [An Introduction to Database Systems, 1995].

> Normalize means "to apply a body of techniques to a relational database in order to **minimize the inclusion of duplication information** . . . , although at the expense of **creating a larger number of tables**." A4379-80 [Microsoft Computer Dictionary, 1997].

> Normalization is "a process which **breaks down data into record groups** for efficient processing." A4588 [The Computer Glossary, 1995].

*See also* A1535-39 [CC Slides].  Thus, the intrinsic and extrinsic evidence, consistently describe "normalizing" as a process of dividing a table into two or

more tables to minimize duplication of data.

### ii. DataTern's Claim Differentiation Arguments Fail

DataTern argues that the '402 Patent's normalization process cannot be a requirement of the "logical table" (or the NSRO) under the doctrine of claim differentiation because some dependent claims explicitly recite "employing normalization," A3312 ['402 Patent] Claim 2, or a "normalization process," A3315 ['402 Reissue] Claims 16 & 17.

At the outset, it should not be surprising that the dependent claims add requirements relating to normalization because the creation of logical tables by normalization is at the core of what is supposedly inventive.  *See* A3282 ['402 Patent, Abstract].  In any event, claim differentiation simply does not apply.  None of the claims would be redundant under the District Court's construction. *See Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1342 (Fed. Cir. 2010) (claim differentiation presumes difference in scope between separate claims only when absence of such difference in scope would make one of the claims entirely redundant).

Claim 1 requires a normalization process, but Claim 2 further requires that the normalization process be performed for a secondary purpose aside from defining a logical table.  As the patent explains, the primary purpose of normalization is to divide physical tables into two or more logical tables to

minimize duplication. A3305 ['402 Patent] 1:30-32). A secondary purpose, however, is to create "foreign key relationships." A3306 ['402 Patent] 4:56-58 ("The normalization process also provides means to create foreign key relationships."). Claim 2 requires that the normalization process create "foreign key relationships from the first of the one or more physical tables or the logical table to another physical or logical table," and therefore further narrows Claim 1's requirement of performing normalization to minimize data duplication. Thus, claim differentiation based on Claim 2 is inapplicable. *See, e.g., SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1358 (Fed. Cir. 2006) (rejecting claim differentiation argument because disputed term was further narrowed by dependent claim).

DataTern's assertion that Claims 16 and 17 support its claim-differentiation position fare no better. Neither claim depends on Claim 1. And it is settled law that patentees may use different claim language in different independent claims to capture the same concepts, especially when drafting both "system" claims (Claims 16 and 17) and "method" claims (Claim 1). *See Andersen*, 474 F.3d at 1370 ("overlapping patent claims are not unusual, and the overlap does not require us to construe the 'composite composition' claims to cover subject matter that differs from the subject matter covered by the other two sets of claims"). In fact, Claims 16 and 17 support Microsoft's construction by tying normalization to the logical

table.  *See* A3315 ['402 Reissue] Claim 16 ("a **normalization process** for forming a normalized relational schema object representing a **logical table**"; Claim 17 ("said **normalization process** further forming a normalized schema object … said normalized relational schema object representing a **logical table**").

Furthermore, the claim differentiation doctrine cannot change the meaning of a claim term established by the intrinsic record. *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369-70 (Fed. Cir. 2007) ("[T]he written description and prosecution history overcome any presumption arising from the doctrine of claim differentiation") (citation omitted); *Curtiss-Wright Flow Ctrl. Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380-81 (Fed. Cir. 2006); *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1115-16 (Fed. Cir. 2002) (claim-differentiation doctrine cannot be used to recapture disclaimed subject matter). Again, the intrinsic record expressly defines and consistently describes a logical table as the result of a normalization process.  A3306 ['402 Patent] 4:29-34; A203-04 [10/21/1998 Response to Office Action].

In light of DataTern's independent concession that none of the accused products "necessarily includes a logical table that results from a normalization process that divides at least one of the physical tables into two or more tables to minimize duplication," the District Court's grant of summary judgment should be affirmed.  A2169 [Opp'n to Motion for SJ].

### iii. The Logical Table "Can Be Utilized Like a Physical Table"

Although Microsoft sought summary judgment based on the portion of the "logical table" construction that requires that the logical table "can be utilized like a physical table,"A5311 [Motion for SJ], this portion formed no part of the basis for the Court's summary judgment of non-infringement. *See* A67 [Order]; A2171 [Opp'n to Motion for SJ]. On appeal, DataTern challenges the District Court's construction that the claimed "logical table" can be utilized "like a physical table." DataTern agrees, however, that "logical table" has a meaning specific to the '402 Patent. A1327 [Gupta Tr.] 95:19-21 ("Yes, I would say that's a correct statement."). And the patent repeatedly explains that the logical table of the invention is utilized "like a physical table":

> "**[E]ach logical table** is a group of at least one column from a table or view associated with a relational database, and **can be utilized like a relational table** or view." A3282 ['402 Patent, Abstract].

> "**Each logical table** is a group of at least one column from a physical table or view associated with a relational database, and **can be utilized like a physical table**." A3305 ['402 Patent, Summary of Invention] 1:47-50.

> "[T]hese **logical tables**…are treated by the mapping process … **exactly as if they are real physical tables** in the database." A3306 ['402 Patent] 4:40-41.

The District Court rejected DataTern's proposed construction that logical tables are merely "representations" of tables, which need not even contain data.

31

*See* A65 [CC Order]; BB 43-44.  DataTern's construction simply paraphrases the claim language that follows the disputed term, namely that the logical table comprises "one or more columns of one or more physical tables." A3312 ['402 Patent] Claim 1; *see also* Claims 4 & 8 ("logical **table comprising** a subset of [said] columns").  This redundant language only supports Microsoft's construction. Indeed, even DataTern admits that the term "table" has an established meaning in the relational database arts beyond merely a "representation."  A1088 ("Tables present rows of data organized in one or more columns, such as the way data is presented in a spreadsheet.").  And the specification unambiguously defines a "logical table" as a "new *table*" created from a "normalization process."  A3306 ['402 Patent] 4:29-34.  DataTern's attempt to strip this term of its most basic characteristic – that it is a table – must be rejected.

## B. The District Court Properly Construed "Normalized Relational Schema Object Representing A Logical Table"

The term "normalized relational schema object" appears neither in the specification of the '402 Patent nor in the originally-filed claims.  A151-53 ['402 Original Application] Claims 1-8.  But this phrase has an established meaning to those skilled in the art reading the patent.  Three requirements are implicated by this claim term: (1) there must be an "object" that contains "relational schema"; (2) the "relational schema" must be "normalized"; and (3) the "relational schema" is

32

"of the logical table."  The District Court adopted Microsoft's proposed construction of this term: "an object containing schema of the logical table that resulted from a normalization process that divided the physical table into two or more tables to minimize duplication."  The District Court's grant of summary judgment was based only on requirement (2), namely, that the NRSO term requires the normalization process described in the specification and adopted by the District Court's construction.

### i.  The Relational Schema Must Be Normalized

The plain language of the term "normaliz**ed**" requires prior normalization of the relational schema.  A1169-74, A1203-06 [Hosking Decl.] ¶¶ 45-52, 112-118. Figure 5 illustrates the normalization process of the '402 Patent, as described above in the context of "logical table." *See supra* Argument, §III.A; A3287 ['402 Patent, fig 5]; A3306 ['402 Patent] 4:29-41.  Again, normalization involves dividing a captured table into two or more logical tables to minimize duplication. As the abstract explains, "[o]nce a denormalized table is captured from a database the **normalization process allows** the user to define **different logical tables using subsets of the columns of the table**." A3282 ['402 Patent, Abstract].  The District Court correctly recognized that "[t]he language of the specification and the context of the overall patent suggests no other normalization procedure."  A62 [CC Order]. And for all of the reasons discussed in the context of "logical table," including the

specification's description of normalization in the context of the creation of logical tables and the confirmatory prior art definitions of normalization, the NRSO requires "a normalization process that divided the physical table into two or more tables to minimize duplication." A65 [same].

### ii. The NRSO Is An Object Containing Relational Schema That Is "Of the Logical Table"

Although not relevant to the summary judgment grant, the District Court also found that the NRSO is "an object containing schema of the logical table." These elements of the construction are proper.

"Schema" is a term of art that provides a description of the organization of the database such as, for example, the names of tables in the database and the column headings for those tables. A1201 [Hosking Decl.] ¶ 106; A3305 ['402 Patent] 2:55-58. The '402 Patent specification likewise shows "schema objects" in Figure 4 as containing relational-database ("Rdb") table names ("OC_Rdb**Table**") and column names ("OC_Rdb**Column**"). A3306 ['402 Patent] 3:40-45.



A3286 ['402 Patent, fig.4] (red annotations supplied). The word "relational" in the phrase "relational schema" refers to a relational database. "Relational schema" means, simply, "schema" derived from such a database—or, more precisely, schema derived from a table in the relational database. A1201-02 [Hosking Decl.] ¶¶ 107-109. The specification explains that a "capture" process "reads the relational schema from the relational database 18 and creates the Relational Schema Objects 12." A3305 ['402 Patent] 2:52-55. Accordingly, NRSOs are objects that contain relational schema.

Furthermore, the full claim term "normalized relational object **schema** representing a **logical table**" indicates that the schema and logical table are inextricably intertwined. A3312 ['402 Patent]. The "schema object" must contain schema of the "logical table." As the patent explains, "[o]nce a denormalized table

35

such as table AP is captured from a database, the normalization process allows the user to define different tables [that are] henceforth referred to as a logical table." A3306 ['402 Patent] 4:29-34. Figure 7 shows the "relational schema objects" containing these logical tables. A3289 ['402 Patent, fig.7]; A3306-07 ['402 Patent] 4:54-5:15 (showing "Integrator Normalization Process" **32** results in logical tables "Table P_L" and "Table A_L"). Thus, the District Court was correct to construe the NRSO term in the context of the larger phrase, as Microsoft requested, and to require that the object contain "schema of the logical table." A65 [CC Order].

### iii. DataTern's Vague and Unsupported Construction of NRSO Must Be Rejected

DataTern asks the court to construe NRSO as "a construct representing a logical table, or a portion thereof, in which a logical primary key has been designated." A1278 [Joint CC Report]; BB7. DataTern's expert states that NRSO "is not a term of art" and that the inventor simply "made it up" A1133 [Gupta CC Report] ¶ 29; A1328 [Gupta tr.] 101:11-14). But coined terms must be defined in the specification or file history, and this phrase is not. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[A] patentee may choose to be his own lexicographer … as long as the special definition of the term is clearly stated in the [intrinsic record].") Because the term is not defined, the District

36

Court properly based its construction on the meaning of each of the term's constituent words.

DataTern's alternative argument that the normalization process required by the District Court's construction is "divorced from the 'integrator normalization' process taught by the specification," BB42-43, is contradicted by the intrinsic record and by DataTern's expert testimony. DataTern would equate "normalized" with the identification of a logical primary key, BB20-21, a tool by which data in each row of a table can be identified uniquely and referenced across tables, A1167-69 [Hosking Decl.] ¶ 40-44. But DataTern's definition of normalization is redundant with the balance of the claim, which requires "designating one column of the logical table as a logical primary key column." A3312 ['402 Patent] Claim 1. Moreover, Mr. Gupta admitted that DataTern's definition of "normalization" does not even guarantee that a table has been normalized, as he conceded that a table with a designated primary key may be in either normalized or de-normalized form. A1318 [Gupta Dep.] 61:15-19; A1323 [same] 78:1-4; A1598-99 [CC Slides]. That the designation of a primary key does not result in normalization is further confirmed by the prosecution history. A186 [7/23/1998 Office Action] ("the primary key (210) in a *denormalized* table is used to access data in a relational database").

However, the most serious flaw in DataTern's proposed construction of what it purports is a newly-minted term is not even that it is unsupported by the intrinsic record. DataTern's proposed construction adds no limitation at all. Other than adding the word "construct," the proposed construction simply recites the other claim language. But the NRSO described in the '402 Patent is more than a construct. It is repeatedly defined as being an object containing schema of the logical table that resulted from a normalization process. DataTern's proposed construction fails to incorporate this important characteristic. DataTern's proposed construction adds no limitation at all and should, for all of the foregoing reasons, be rejected.

## IV. THERE IS, AND HAS BEEN, AN ACTUAL CONTROVERSY BETWEEN MICROSOFT AND DATATERN

DataTern claims that, despite its repeated assertion in its customer suits that Microsoft's products infringe the Patents-in-Suit, the District Court lacked jurisdiction because there was no case or controversy between it and Microsoft. The leading case governing the jurisdictional issue is *Arris Group, Inc. v. British Telecomms. PLC*, 639 F.3d 1368 (Fed. Cir. 2011). In *Arris*, this Court set forth a two-pronged test for a supplier's standing to initiate a declaratory judgment action "where a patent holder accuses customers of direct infringement based on the sale or use of" the supplier's product:

(a) the supplier is obligated to indemnify its customers from infringement liability, or

(b) there is a controversy between the patentee and the supplier as to the supplier's liability for induced or contributory infringement based on the alleged acts of direct infringement by its customers.

*Id.* at 1375. As the *Arris* court explained, in either scenario, *Medimune*'s requirement that there is a "substantial controversy [over] an adverse legal interest" is satisfied because there exists "an underlying legal cause of action that the declaratory defendant *could have brought*" against the declaratory plaintiff. *Id.* at 1374 (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 132 n.11 (2007)).

Thus, where, as here, a "patent holder accuses customers of direct infringement based on" the "use of the supplier's" product, declaratory judgment jurisdiction is proper because such accusations establish that the patentee *could have brought* indirect infringement claims against the supplier. *Id.* at 1375. Indeed, absent declaratory-judgment jurisdiction, a manufacturer would be without effective recourse to safeguard its right to conduct legitimate business and protect its product from a patentee's intimidation and harassment of its customers. *See Kessler v. Eldred*, 27 S. Ct. 611 (1907) (recognizing a manufacture's freestanding right to legitimately conduct business free from a patentee's harassment and intimidation of the manufacturer's customers). "No one wishes to buy anything if

with it he must buy a law suit," *id*., and Microsoft was entitled to protect its products and customers against DataTern's harassment.

DataTern *refuses* to address this basis for jurisdiction in its opening brief. Nor does DataTern dispute that its infringement assertions against Microsoft customers featuring their use of Microsoft software established a controversy regarding Microsoft's indirect infringement liability. And, if there were any doubt about the existence of an actual controversy, DataTern's litigation strategy and refusal to grant Microsoft a covenant not to sue confirm that there is a justiciable controversy.

## A. DataTern's Infringement Claims Against Microsoft Customers Feature ADO.NET and Underscore The Parties' Real and Substantial Controversy

It is undisputed that DataTern could have brought indirect infringement claims against Microsoft and, thus, had an adverse legal interest *vis à vis* Microsoft. *See Arris*, 639 F.3d at 1374 (adverse legal interest exists where there is "an underlying legal cause of action that the declaratory defendant could have brought" against the declaratory plaintiff). As DataTern straightforwardly admits, its infringement claims against Microsoft's customers are based on the customers' "use" of "Microsoft . . . software to infringe the '502 patent and/or the '402 patent." *See* A4913-14 [Infringement Contentions]. Indeed, DataTern *itself*

contends that it has "indirect infringement" claims against Microsoft based on this customer use. *Id.* Accordingly, DataTern's threats to customers necessarily carried with them at least implied assertions of indirect infringement against Microsoft. *See Arris*, 639 F.3d at 1378.

DataTern's infringement claims against Microsoft customers bear this out. For instance, just days after filing the *Eli Lilly* action,[3] DataTern began sending demand letters offering to settle the case for $300,000. It attached to these letters "generic claim charts" directed to "[u]sers of Microsoft ADO.NET." *See, e.g.,* A795-796 [Volkswagen demand letter]; A817. These generic charts specifically identified Microsoft's ADO.NET product as providing the "accused instrumentalities," but failed to identify—much less attempt to distinguish amongst—any of the customers' various products. *See, e.g.,* A817-826. And, throughout its claim charts, DataTern alleged—using quotations, annotated figures, and paraphrasing from Microsoft's technical documentation and ADO.NET reference manuals—that Microsoft's software purportedly meets every limitation of the "exemplary" claims. *See, e.g.,* A817-826 (citing ADO.NET functionality *alone* as the accused instrumentality for every limitation of Claim 1 of the '402

---

[3] *DataTern, Inc. v. Eli Lilly & Co. et al.*, No. 2:10-cv-413 (E.D. Tex.)

Patent).[4] Such product-focused infringement claims were precisely what this Court found sufficient to confer subject matter jurisdiction in *Arris*. *See Arris*, 639 F.3d at 1377-78.

A comparison of DataTern's infringement claims to those found to confer jurisdiction in *Arris* demonstrates that the case for jurisdiction is even stronger here. First, just as in *Arris*, Microsoft's products were featured extensively throughout DataTern's claim charts. In *Arris*, this Court relied on the fact that, although the infringement contentions at issue "did not expressly" accuse Arris of indirect infringement, they "repeatedly singled out Arris' products" to support the infringement claims. *Id.* at 1376-77. Specifically, the "118-page presentation of … infringement" contentions "discuss[ed] Arris' CMTS and E-MTA products on at least 77 pages." *Id.* at 1377. Here, *every single page* of DataTern's "generic claim charts" featured ADO.NET.[5] Indeed, in the ten pages of "generic" charts, DataTern referenced "ADO.NET" seventeen times. *See, e.g.,* A817-826.

---

[4] DataTern provided other Texas defendants with a second type of DataTern claim chart—labeled "illustrative infringement contentions" or preliminary infringement contentions, the latter of which DataTern served in the Texas actions. These charts largely mirror the "generic claim charts," with one basic variation—for the opening preamble of each claim, the chart lists a specific application maintained by a Microsoft customer. *See, e.g.,* A758-771; A777-790.

[5] Likewise, DataTern's "illustrative infringement contentions" discuss ADO.NET on 18 of 24 pages and reference "ADO.NET" nearly 50 times. *See, e.g.,* A890-913.

Second, as in *Arris*, DataTern's infringement claims specifically and repeatedly reference Microsoft by name, identify Microsoft's product by its trade name, and copy language directly from ADO.NET product literature and reference materials. *See Arris*, 639 F.3d at 1377 ("On at least 26 pages [of a total of 118], Arris was specifically referenced by name, Arris' products were identified by brand name and model number . . . , and Arris' product literature was copied from its website for illustrative effect."). DataTern's ten-page "generic claim charts" "specifically reference by name" Microsoft more than once per page, and its "illustrative" contentions reference Microsoft more than 21 times. *See, e.g.*, A817-826; A890-913. Additionally, in *Arris*, this Court found that the patentee's identification of Arris products "as satisfying at least one element or method step for every asserted claim" analyzed created an "implie[d]" assertion of indirect infringement." *Id*. at 1377.

Here, DataTern's claim charts specifically identify ADO.NET as essential to *every* limitation of the asserted claims analyzed. *See, e.g., A817-826. Further, DataTern itself confirmed that ADO.NET is "central to [its] infringement contentions," *Arris*, 639 F.3d at 1377, stating that its infringement claims against Microsoft's customers are based on the customers' "use" of "Microsoft . . . software to infringe the '502 patent and/or the '402 patent." *See* A4913-14.

DataTern's claim charts are far more focused on Microsoft's product than

those found sufficient to establish jurisdiction in *Arris*. Not only is ADO.NET

referenced throughout the infringement analysis, but, unlike in *Arris*, DataTern's

"generic claim charts" do not reference a single product or service of the alleged

direct infringer. As noted, the claim charts do not even identify the customer that

allegedly infringes, but, instead, simply refer to infringement by "[u]sers of

Microsoft ADO.NET." *See, e.g.,* A817. They each include substantively identical

allegations against each of DataTern's targeted victims. *See, e.g.*, A758-771;

A777-790; A797-826; A828-857; A861-886; A890-913; A925-929; A940-949;

A962-973. DataTern's use of "generic" claim charts, and its failure to

meaningfully differentiate one Microsoft customer's purported infringement from

another's, confirms that ADO.NET (and thus, Microsoft) is its true target.[6]

Moreover, the steady influx of defense and indemnification demands

---

[6] Without disputing the claim charts' repeated (and in some cases, exclusive) reference to ADO.NET as the accused instrumentality, DataTern attempts to undo its indirect infringement claims against Microsoft by claiming that Microsoft somehow "agreed" that the charts do not accuse Microsoft software. *See* BB29. But this is little more than a sleight of hand. While Microsoft's corporate designee stated his belief that the claim charts did not accuse "Microsoft Software **code**" of infringement, he never stated that the charts did not implicitly accuse Microsoft of indirect infringement through its activities involving ADO.NET. *See* A3558 at 133:11-19. In any event, any subjective belief about DataTern's infringement claims held by Microsoft or its corporate designee is irrelevant to the jurisdictional inquiry. *Hewlett-Packard Co. v. Acceleron LLC*, 587 F.3d 1358, 1363 (Fed. Cir. 2009) ("The test for declaratory judgment jurisdiction in patent cases, however stated, is objective. . . . Indeed, it is the objective words and actions of the patentee that are controlling.").

Microsoft received based on DataTern's claims in the Texas actions underscores the immediacy and reality of the controversy surrounding ADO.NET's liability and the adversity of legal interest. *See, e.g.,* A953; A955; A957; A960; A962; A975. Indeed, that Microsoft customers demanded defense and indemnification based on DataTern's Texas allegations establishes a second, independent adverse legal interest between DataTern and Microsoft sufficient to support jurisdiction. Although this Court has previously suggested that an indemnification agreement is *sufficient* to confer jurisdiction, *see Microchip Tech., Inc. v. Chamberlain Grp.*, 441 F.3d 936, at 944 (Fed. Cir. 2006), no case has held that an agreement is a necessary condition to jurisdiction where a supplier's customers have demanded indemnity. Nor would it make sense as a matter of legal analysis or policy to distinguish between agreements and demands given that both give rise to the same legal adversity between the patentee and supplier. In any event, customers demanding defense and indemnity from Microsoft here did so pointing to defense/indemnity provisions in their contracts with Microsoft. *See, e.g.,* A953; A955; A957; A960; A962; A975. This is an independent basis to find legal adversity.

**B. DataTern's Attempts To Distinguish *Arris* Are Meritless**

DataTern's attempted distinctions of *Arris* lack merit.

DataTern first contends that, because it "never threatened to sue" Microsoft

and "never accused it of infringement," the District Court should not have found an "adverse legal interest." *See* BB57 (citations omitted). But this naked attempt to resurrect the "reasonable apprehension of suit" test discarded by the Supreme Court in *MedImmune* is flawed on multiple levels.

This argument simply ignores the point of *Arris*—*i.e.*, that a patentee's infringement claims against a declaratory plaintiff's customer based on that customer's *use* of the plaintiff's product constitute an "implicit assertion" of indirect infringement sufficient to create an Article III "adverse legal interest." *Arris*, 639 F.3d at 1375-76. Indeed, *Arris* made clear that "an express accusation" of infringement against the declaratory plaintiff "is unnecessary" to establish such an adverse legal interest. *Id.* at 1379; *see also ABB Inc. v. Cooper Indus., LLC*, 635 F.3d 1345, 1348 (Fed. Cir. 2011) ("a specific threat of infringement litigation by the patentee is not required to establish jurisdiction"). In fact, none of the three cases *Arris* cites for the proposition that threats against customers may create an "implicit assertion" of indirect infringement mention, much less rely on, pre-suit communications between the patentee and the declaratory plaintiff. *Arris*, 639 F.3d at 1375 n.6 (collecting cases).

Where a patentee has created an actual controversy with a supplier through its accusations against customers, that patentee cannot nullify jurisdiction simply by avoiding express infringement allegations against the supplier. *See Arris*, 639

F.3d at 1380. Thus, in *Arris*, the patentee's express disclaimer in its claim charts that "nothing in its assertion [against Arris's customer] is meant to accuse any particular supplier of infringement" was deemed immaterial to the jurisdictional calculus and "at best a transparent attempt to defeat Arris' standing." *Id*. at 1380. Because the patentee's claims against Arris's customer carried an implied assertion of indirect infringement, the disclaimer was effectively meaningless. *Id*. Likewise, any attempt by DataTern to avoid expressly accusing Microsoft of infringement in the Texas actions cannot vitiate the controversy with Microsoft that DataTern created when it accused Microsoft customers' use of ADO.NETof infringement. *See id*. ("The actual controversy with Arris that BT has created by its [customer] accusations cannot be so easily avoided.").

None of the authorities on which DataTern relies compel a different outcome from *Arris*, much less resemble the facts here. Specifically, ***not one*** of DataTern's authorities involves the implied assertions of indirect infringement present here and deemed sufficient to confer jurisdiction in *Arris*. Indeed, in *Creative Compounds, LLC v. Starmark Labs*., 651 F.3d 1303 (Fed. Cir. 2011), there were ***no*** infringement claims (implied or actual) asserted against the declaratory plaintiff because the declaratory plaintiff did not exist when the patentee sent letters to purchasers of the allegedly infringing compound. 651 F.3d at 1316. Consequently, there was no "legally cognizable interest" sufficient to confer

jurisdiction. *Id.*

*Innovative Therapies, Inc. v. Kinetic Concepts, Inc.*, 599 F.3d 1377 (Fed. Cir. 2010) is similarly inapposite. There, the only cognizable facts supporting jurisdiction were: (1) the declaratory plaintiff's own representations to the FDA about "technical characteristics" of its product; (2) phone calls initiated by the declaratory plaintiff with employees of the defendant who lacked decision-making authority and had not seen plaintiff's product; and (3) the defendant's "history of litigation" against others in the industry. *Id.* at 1380-182. The patentee had made no accusation of infringement and had not even seen the declaratory plaintiff's product. *Id.* at 1382. In the absence of any infringement allegations, this Court affirmed the denial of jurisdiction. *Id.* at 1385.

DataTern's reliance on *Microchip* also fails. DataTern appears to suggest that, under *Microchip*, Microsoft cannot have an "adverse legal interest" *vis-à-vis* DataTern because Microsoft has not agreed to indemnify its customers. *See* BB30.[7] As a threshold matter, citing *Microchip* is wholly unhelpful because it

---

[7] DataTern's suggestion (BB31) that Microsoft does not consider the Texas defendants "its customers" is both misleading and legally irrelevant. In the deposition testimony DataTern cites, Microsoft's 30(b)(6) witness simply stated that he "personally" preferred to refer to the Texas defendants as "user[s] of Microsoft software," rather than "customers" or "licensees." A3559 at 136:13, 137:11-13. The witness expressly communicated that he was *not* testifying in his corporate capacity and conceded that his semantic preference was probably due to

predates the Supreme Court's repudiation of the reasonable apprehension of suit test in *MedImmune*. *See MedImmune*, 549 U.S. at 157. Moreover, DataTern's argument refuses to acknowledge this Court's holding in *Arris* that **either** an indemnification obligation **or** a controversy regarding liability for indirect infringement is sufficient confer declaratory judgment jurisdiction. *Arris*, 639 F.3d at 1375. Unlike in *Arris* and this case, *Microchip* lacked implied assertions of indirect infringement because Microchip failed to "identif[y] a *single legal claim* it believe[d]" the patentee could have brought." *Microchip*, 441 F.3d 936, 943 (Fed. Cir. 2006). Because Microchip could not identify legal adversity between it and the declaratory plaintiff, this Court properly held that Microchip's economic interest in clarifying its customers rights, untethered to any legal dispute, could not confer jurisdiction.

Finally, DataTern's half-hearted attempt to distinguish *Arris* via footnote is both factually and legally flawed. As a threshold matter, DataTern misstates the facts of *Arris* when it claims that Arris "had an <u>undisputed legal obligation</u> to indemnify its customer." BB31 n.4 (emphasis in original). In truth, that case

---

his "over lawyerly carefulness." A3559 at 136:24-25. In any event, DataTern does not dispute that the semantic label attached to a product's end-user is legally irrelevant to whether an indirect infringement claim lies. And, if Microsoft's use of the label matters, Microsoft applied the term "customers" in the court below to users of Microsoft's accused products. *See, e.g.,* A719. A727, A3646.

49

involved "no express indemnification agreement." *Arris*, 639 F.3d at 1375. Arris simply "contend[ed]" that "it *risk[ed]* being held liable" for indemnification, but that risk was disputed. *Id.* Significantly, the *Arris* decision expressly *declined* to address the indemnification issue because it found the facts surrounding the patentee's implied indirect infringement allegation sufficient. *Id.* The Court, thus, made clear that, even absent an indemnification obligation, a controversy regarding liability for indirect infringement will confer declaratory judgment jurisdiction. *Id.*

DataTern also makes much of the fact that Microsoft did not directly participate in the licensing negotiations between DataTern and Microsoft's customers as part of the Texas actions. *See* BB31 at n.4. But this contention flatly ignores this Court's rule that "*direct* communication between a patentee and a declaratory plaintiff is not necessary to confer standing." *Arris*, 639 F.3d at 1378. Consequently, DataTern is incorrect in suggesting that Microsoft's lack of direct involvement in the Texas license negotiations somehow defeats jurisdiction. *See id.* (citing *Arrowhead*, 846 F.2d at 736 (jurisdiction "may be found in the absence of any communication from the defendant to the plaintiff"); *see also supra* § IV.B (express infringement accusations not required).

**C. The District Court Properly Considered "All The Circumstances" Bearing On The Parties' Controversy**

DataTern is wrong in suggesting that the District Court's reference to post-

complaint facts was improper. Although post-filing events cannot cure jurisdictional defects, such events may confirm the propriety of jurisdiction. *See BP Chems. v. Union Carbide Corp.*, 4 F.3d 975, 980 (Fed. Cir. 1993) ("Although it is the situation at the time suit was filed that establishes the existence *vel non* of an actual controversy" subsequent "events can reinforce the correctness of the conclusion."). Each of the three post-filing "events" with which DataTern takes issue provides such confirmation.

DataTern first takes issue with the District Court's reference to its conditional counterclaims against Microsoft of indirect infringement. Contrary to DataTern's suggestion, however, the District Court did not rely on the counterclaims *themselves* to establish jurisdiction. Rather, DataTern's implied assertion that it had a Rule 11 basis for filing the counterclaims was overwhelming objective evidence of "an underlying legal cause of action that the declaratory defendant *could have* brought," which the District Court properly assessed under *Arris*. *See Arris*, 639 F.3d at 1374("an underlying legal cause of action that the declaratory defendant *could have* brought" is an "example" of an "adverse legal interest" sufficient to confer jurisdiction); *Acceleron*, 587 F.3d at 1363 ("The test for declaratory judgment jurisdiction in patent cases, however stated, is objective," based on "the objective words and actions of the patentee."). The District Court's

reference to DataTern's counterclaims was both proper and made good sense.  For the same reasons, the District Court's reference to the inclusion of DataTern's indirect infringement claims in the proposed scheduling order was also proper.

Additionally, DataTern's refusal to grant Microsoft a covenant not to sue confirms that an actual controversy exists.  As this Court reaffirmed in *Arris*, "a patentee's refusal to give assurances that it will not enforce its patent is relevant to the determination of declaratory judgment standing."  *Arris*, 639 F.3d at 1381 (quoting *Prasco v. Medicis Pharm. Corp.*, 537 F.3d 1329, 1341 (Fed. Cir. 2008)); *3M Co. v. Avery Dennison Corp.*, 673 F.3d 1372, 1381 (Fed. Cir. 2012) (refusal to provide a covenant not to sue may provide additional support for the existence of an actual controversy).  Such refusal may support jurisdiction even if it occurred after filing.  *See, e.g., Arris*, 639 F.3d at 1380-81 ("BT's refusal to grant Arris a covenant not to sue" at oral argument "provides a level of additional support for our finding that and actual controversy exists").

## D. DataTern's Litigation Strategy Provides Additional Support For The District Court's Exercise Of Jurisdiction

DataTern's aggressive litigation strategy and its status as an enforcement entity "signal[s] the existence of an actual controversy" and provides even more support for the District Court's assertion of jurisdiction.  *Acceleron*, 587 F.3d at 1364 n.1; *Prasco*, 537 F.3d at 1341 ("Prior litigious conduct is one circumstance to

be considered."); *Ass'n for Molecular Pathology*, 653 F.3d at 1345 (same).

DataTern has sued more than 100 entities for purported infringement of the '402

and '502 Patents.  *See* A3601.  This, too, buttresses the existence of an actual

controversy.

## <u>CONCLUSION</u>

For the foregoing reasons, the District Court's judgment should be affirmed.

Respectfully submitted,

Dated:  June 6, 2013

By:  */s/ Edward R. Reines*
Edward R. Reines
Andrew L. Perito
Evan N. Budaj
WEIL GOTSHAL & MANGES LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Telephone: (650) 802-3000

Dan Goettle
Dale M. Heist
WOODCOCK WASHBURN, LLP
1650 Market Street, 12th Floor
Cira Centre
Philadelphia, PA 19013
Telephone: (215) 564-8915

*Counsel for Microsoft Corporation*

# CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25 and Fed. Cir. R. 25, I certify that on this day I served the foregoing via the Court's CM/ECF on the principal attorneys for each party.

Dated:  June 6, 2013       _/s/ Edward R. Reines_
               Edward R. Reines
               *Counsel for Microsoft Corporation*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that the body of this brief, beginning with the Abbreviations and Conventions on page vi, and ending with the last line of the conclusion on page 53, including headings, footnotes, and quotations, contains 11,026 words, in compliance with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

Respectfully submitted,

Dated:  June 6, 2013

By:   */s/ Edward R. Reines*
Edward R. Reines
*Counsel for Microsoft Corporation*